CITY OF MINNEAPOLIS, Appellant,

v.

AMES & FISCHER CO. II, LLP, Respondent,

Capitol Indemnity Corp., Respondent,

and

Ames & Fischer Co. II, LLP, Respondent,

v.

City of Minneapolis, et al., Appellants.

No. A05–2316.

Court of Appeals of Minnesota.

Dec. 12, 2006.

---

Charles N. Nauen, William A. Gengler, Gregory J. Myers, Lockridge Grindal Nauen, P.L.L.P., Minneapolis, MN; and Jay M. Heffern, Minneapolis City Attorney, Peter Ginder, Assistant City Attorney, Minneapolis, MN, for appellants City of Minneapolis and Minneapolis Community Development Agency.

Steven J. Weintraut, Mark Thieroff, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for respondent Ames & Fischer Co. II, LLP.

David H. Gregerson, Siira B. Gunderson, Gregerson, Rosow, Johnson & Nilan, Ltd., Minneapolis, MN, for respondent Capitol Indemnity Corporation.

Considered and decided by PETERSON, Presiding Judge; RANDALL, Judge; and KALITOWSKI, Judge.

## OPINION

RANDALL, Judge.

This is an appeal from an order denying a motion for summary judgment by appellant city and agency to dismiss respondent's tort claims and counterclaims based on statutory and vicarious official immunity. Appellants sued respondent Ames & Fischer Co. II, LLP for breach of contract for its failure to make certain payments arising out of a parking ramp construction project, and respondent counterclaimed and sued alleging misrepresentation and related claims regarding projected cash flow from the parking ramp. Appellants argue their decisions and conduct, set forth in the counterclaims, related to making and sharing the projections, are discretionary and, thus, are protected by statutory and vicarious official immunity.

Respondent argues that appellants are responsible for their decisions and their conduct, claiming appellants sued for breach of contract and, thus, respondent has a right to defend on the merits.

We agree that respondent has a right to defend appellants' claims on the merits, but reverse the denial of appellants' motion to dismiss respondent's counterclaims. Respondent's counterclaims do sound in tort and, thus, statutory and official immunity are available to appellants, but only as to respondent's counterclaims. We reverse.

## FACTS

This appeal arises out of a contract dispute between respondent Ames & Fischer Company II, LLP, and appellants Minneapolis Community Development Agency (MCDA) and the City of Minneapolis (the city). Respondent company was formed for the sole purpose of owning and leasing the John Deere Building, located in the Minneapolis warehouse district. After the building was purchased in 1989, respondent began renovating the building to attract additional tenants. During the course of the renovation project, respondent realized that the lack of adequate parking nearby restricted the needs of the customer desiring office space in the area. To solve its dilemma, respondent wanted to build a parking ramp next to the John Deere Building. Because a privately owned, tax-paying parking ramp was not economically feasible, respondent determined that it needed a publicly-owned, tax-exempt parking ramp. Respondent began lobbying the city and the MCDA for an agreement under which it would finance construction of a parking ramp. Under the proposed agreement, respondent would build and then sell the parking ramp to the

city, which would sell bonds to finance the purchase. The bonds would, in turn, be repaid from net parking revenues from the ramp and tax-increment financing revenues generated by respondent's renovation of the John Deere Building.

While negotiating with respondent, the city and the MCDA analyzed whether the proposed parking ramp project was consistent with the city's goals and plans for the warehouse district, what the parking needs were in the area, and whether the project was economically feasible. This process is reflected in the MCDA's 10th Avenue North & Washington Avenue North Redevelopment Plan & Tax Increment Finance Plan (the plan). Pursuant to the plan, the MCDA authorized the use of tax increment revenue to help fund the parking ramp project. The objective was

> to facilitate the rehabilitation and commercial reuse of the historic John Deere building, and other loft manufacturing buildings located in the Warehouse Riverfront District, by providing a needed public parking facility for employee and customer parking in the area. The public purpose that will be achieved by the implementation of these plans include blight remediation, historic preservation, and the development of needed public parking facilities.

As part of the parties' discussions and consideration of the parking ramp project, the MCDA provided respondent with several spreadsheets showing projected revenues, expenses, and debt service for the proposed ramp for the years 2000 through 2006. The projections were "made for the purpose of estimating debt service coverage and cash flow," and were used by the city and the MCDA in "determining whether it was reasonable and feasible to issue general obligation bonds to purchase

the Parking Ramp from [respondent]." The projections were also reviewed by two of respondent's accountants, and relied upon by respondent in determining whether to go forward with the project. Although the various financial assumptions underlying the various projections differed, respondent claims that each set of projections provided by MCDA showed the parking ramp operating at an annual surplus within a few years, with sufficient revenue to pay off the bonds within 30 years.

Relying on the projections provided by the MCDA, respondent entered into a contract with the MCDA on September 28, 1999, to build the parking ramp (the "contract"). Under the contract, respondent initially financed and constructed a 640–stall parking ramp adjacent to and connected with the John Deere Building. Upon completion of construction, the city purchased the parking ramp from respondent with the proceeds from $10.8 million in general obligation parking revenue bonds (the bonds). Respondent also entered into a management agreement to operate the parking ramp.

Pursuant to the contract, respondent guaranteed payment of the parking ramp costs and payment of the bonds. Section 5.03 of the contract states that respondent will obtain a security bond "in an amount sufficient to pay for the estimated, annual debt service for the Bonds and the Parking Fund Loan and the estimated annual operating costs for the Parking Facility." The contract further states that the security bond

> will provide that it shall be payable to the City, upon presentation to the underwriter of the Security Bond in the event the sum of the parking revenues generated by the Parking Facility and

the Tax Increment revenue generated by the Minimum Improvements [to the John Deere Building] are not equal to or in excess of the sum of the annual debt service for the Bonds, the Parking Fund Loan and the operating cost for the Parking Facility as determined by the City and reviewed by [respondent].

Based on the terms of the contract, respondent obtained a security bond from the surety Capitol Indemnity Corporation (Capitol) in the amount of $375,904 in March 2004.

The parking ramp has operated at a net loss every year since it opened in September 2000. The City initially notified respondent in December 2002, that there was a shortfall in the amount of $364,978. Respondent answered by requesting more information. Over the next 18 months, the city accommodated respondent's requests for additional information and provided updates of the shortfall with a detailed analysis of the parking ramp revenues and expenses. Based on that information, respondent determined that the actual expenses and revenues differed substantially from the projected expenses and revenues initially provided by the MCDA.

By October 2004, a shortfall in net revenues in excess of $2.5 million had accumulated. The city provided notice, as required by the contract, that it intended to draw on the security bond and sue for the balance unless respondent satisfied the shortfall. Respondent disputed the shortfall and refused to pay. The city subsequently presented the security bond to surety Capitol for payment. Respondent responded by demanding that Capitol not honor the city's request. Capitol obliged and has not made payment to the city.

In November 2004, the city brought suit against respondent and Capitol, alleging breach of contract and seeking to recover on the security bond and to enforce respondent's guarantee to cover all shortfalls related to the parking ramp. Respondent answered and counterclaimed, asserting tort claims for fraudulent misrepresentation, negligent misrepresentation, breach of an implied warranty, promissory estoppel, breach of an implied covenant of good faith and fair dealing, and for a declaratory judgment. Shortly thereafter, respondent commenced a parallel action against the city and the MCDA, asserting claims identical to its counterclaims. The two actions were consolidated into this action.

Following consolidation, the parties engaged in several rounds of written discovery. During this period, respondent purportedly learned that the city and the MCDA failed to provide respondent with significant information that cast doubt on the financial feasibility of the parking ramp project and the validity of the information that the city and MCDA had provided. According to respondent, the city and the MCDA had prepared other sets of projections using assumptions the city and MCDA viewed as more realistic. These projections, which respondent claims were not provided to them, showed the proposed parking ramp losing money. Respondent claimed that the city and the MCDA withheld this information, despite having a general policy and practice of sharing all financial feasibility information with developers. Thus, as a result of the evidence gathered during discovery, respondent sought to amend its complaint and answer and counterclaims to add several additional claims and factual allegations to support those claims.

In September 2005, the city and the MCDA moved for summary judgment on all of respondent's tort claims on a variety

of grounds, including statutory and official immunity. However, before the city's and the MCDA's memorandum of law in support of the summary judgment motion was due, respondents sent to the city and the MCDA, two draft proposed amended answers and counterclaims. The first proposed draft added: (1) several new affirmative defenses; (2) new allegations regarding "omitted material information;" (3) an entirely new claim for reckless misrepresentation; and (4) new requested remedies of contract cancellation and/or termination. The second proposed draft, sent a few days later, focused on new allegations that the MCDA made misrepresentations "that there was demand for the use of the Parking Ramp in the area in general" even though the MCDA "had reached the conclusion that there was not any demand for the use of the Parking Ramp in the area in general."

Because the city and the MCDA concluded that respondent's proposed amendments lacked merit, the city and the MCDA declined to consent to respondent's motion to amend. The city and the MCDA subsequently filed their summary judgment brief addressing respondent's original allegations and claims. Shortly thereafter, respondent filed its motion to amend. The new motion to amend contained a new affirmative defense, failure to mitigate, and also contained extensive new allegations regarding misrepresentations as to the basis for the projections and nondisclosures. A few days later, respondent filed an amended motion to amend that proposed to add two more new claims, joint enterprise and breach of fiduciary duty. At the same time, respondent filed its opposition to the city and the MCDA's summary judgment motion, which essentially abandoned the original claims and focused primarily on respondent's proposed new allegations and claims.

In November 2005, the district court denied in part and granted in part the city and the MCDA's motion for summary judgment. The district court also denied in part and granted in part respondent's motion to amend the answer and counterclaims and complaint. The city and the MCDA (collectively the "appellants") appealed the district court's order to the extent it denied the motion for summary judgment dismissing the tort claims based on immunity.

## ISSUE

Did the district court err in concluding that appellants are not entitled to statutory or vicarious official immunity?

## ANALYSIS

On appeal from summary judgment, an appellate court determines "whether there are genuine issues of material fact and whether the district court erred in applying the law." *Watson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 411 (Minn.1996). The reviewing court views the evidence in the light most favorable to the nonmoving party and resolves any doubts as to the existence of an issue of material fact against the moving party. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981).

■ Respondent initially contends that appellants excluded from the scope of their motion for summary judgment immunity defenses to claims arising out of alleged misrepresentation as to the basis for the projections. Respondent argues that because appellants must establish an entitlement to immunity as to each tortious act alleged by respondent, and because appellants excluded from the scope of their motion for summary judgment the alleged misrepresentation as to the basis for the

projections, the district court could have properly denied summary judgment on this ground alone.

We disagree. The record reflects that appellants asserted statutory and official immunity defenses to *all* pleaded and proposed tort claims, including claims arising out of alleged misrepresentations as to the basis for the projections. In their memorandum in support of their motion for summary judgment, appellants asserted that "[t]o the extent [respondent] has adequately pled and raised genuine issues of material fact with respect to any tort claims, all of which are based on alleged misrepresentations, the claims nevertheless must be dismissed as barred by discretionary and official immunity." Although appellants' summary judgment memorandum focused primarily on respondent's original claims, appellants' summary judgment reply brief asserted that "if the [district] court were inclined to consider [respondent's] new claims at this time, [appellants] have identified numerous fatal legal deficiencies that would justify dismissal or summary judgment," citing and incorporating by reference the arguments made in appellants' brief in opposition to the motion to amend at pages 4 through 26. In their brief in opposition to the motion to amend, at page 26, appellants asserted that "[e]ven if the proposed amendments stated viable claims, they would be barred by discretionary and official immunity." The record demonstrates that appellants specifically asserted statutory and official immunity defenses to respondent's proposed new allegations and counterclaims, and appellants' immunity defense is properly before this court.

█ Appellants argue that their decisions and conduct pertaining to the making and sharing of the projections are protected by statutory and vicarious official immunity. "The applicability of immunity is a question of law, which this court reviews de novo." *Meier v. City of Columbia Heights,* 686 N.W.2d 858, 863 (Minn.App. 2004), *review denied* (Minn. Dec. 14, 2004).

█ Municipalities are generally liable for the torts of their employees if the tort is committed within the scope of employment. *Nusbaum v. County of Blue Earth,* 422 N.W.2d 713, 718 (Minn.1988). But under statutory immunity, municipalities are immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. 466.03, subd. 6 (2004). The purpose of statutory immunity is to protect the legislative and executive branches from judicial second-guessing of certain policy-making activities through the medium of tort actions. *Nusbaum,* 422 N.W.2d at 718. Thus, it is important for courts to focus on the idea that statutory immunity seeks to protect policy-based decisions and to prevent the impairment of effective government. *Id.* at 719.

█ Official immunity is distinct from statutory immunity. In contrast to statutory immunity, official immunity determines whether individuals used discretion on an operational, rather than a policy-making, level. *Pletan v. Gaines,* 494 N.W.2d 38, 40 (Minn.1992); *Riedel v. Goodwin,* 574 N.W.2d 753, 758 (Minn.App. 1998), *review denied* (Minn. Apr. 30, 1998). Official immunity protects a government employee "from fear of personal liability that might deter independent action." *Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs,* 552 N.W.2d 711, 715 (Minn.1996) (citation omitted). For

example, official immunity has often been employed to protect police, and vicariously their municipalities, when they use discretion to make an independent decision while in the line of duty. *See State by Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 571 (Minn.1994).

■ We start our analysis by noting that both parties spend the bulk of their arguments on governmental immunity. This was not necessary. Here, the city sued respondent for breach of contract. "Generally, *sovereign immunity does not apply to contractual obligations.*" *McDonough v. City of Rosemount,* 503 N.W.2d 493, 497 (Minn.App.1993) (emphasis added), *review denied* (Minn. Sept. 10, 1993); *see Schroeder v. St. Louis County,* 708 N.W.2d 497, 503 (Minn.2006) (stating that governmental immunity protects governmental entities *from tort actions*); 10A Eugene McQuillan, *The Law of Municipal Corporations* 29.119 (3d ed. rev. vol. 1990) (stating that governmental immunity does not apply to contract actions). The issue of immunity only arose tangentially because respondent, as part of its defense to the city's breach of contract claim, counterclaimed with various tort theories. An examination of the heart of respondent's defense to the breach of contract case and the thrust of its counterclaims shows them to be virtually identical in theory. Respondent does not deny this. Thus, the end point of our decision is that the city is entitled to immunity on respondent's counterclaims, but that in no way impedes respondent's right to defend against the city's breach of contract action. If part of respondent's defense looks similar to its now dismissed counterclaims based on tort, it is of no consequence. As stated above, a municipality is never entitled to the defense of immunity on a pure contract action, and this is a contract action.

■ Respondent claims two primary defenses to the city's lawsuit: (1) the city intentionally withheld negative information while providing favorable information to induce the deal, and (2) the city intentionally gave respondent favorable projections of expenses and income knowing (according to respondent) that they were flawed. Under contract principles, mutual acceptance is essential. *See Mattice v. Minn. Prop. Ins. Placement,* 655 N.W.2d 336, 344 (Minn.App.2002) (stating that the basic elements of a contract are offer, acceptance, and consideration), *review denied* (Minn. Mar. 18, 2003). Respondent alleges there was no mutual acceptance because they were intentionally misled and improperly induced to enter the contract.

The argument by appellants that respondent had the right to hire their own consultants and that respondent should have acted with due diligence is a good argument—for trial. This is simply a summary judgment motion. With appreciated candor, appellants concede that some of their arguments rebutting respondent's claims are that the most logical inference to be drawn from documents in the record is that respondent cannot prove its claims. They agree that on a motion for summary judgment, *the non-moving party* gets the favorable inference. *See Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (stating that on review from summary judgment, all reasonable inferences favor the nonmoving party).

In handling respondent's proposed amendments, the district court granted some of the proposed amendments while denying others. This was a proper exercise of the district court's broad discretion. *See id.* (stating that it is well-established that a district court has broad discretion to grant or deny leave to amend a complaint).

This broad discretion is particularly important when you have a complex case, such as this one, and the need for resolution is important. *See Bebo v. Delander*, 632 N.W.2d 732, 741 (Minn.App.2001) (stating that "the liberality to be shown in the allowance of amendments to pleadings depends in part upon the stage of the action and in a great measure upon the facts and circumstance of the particular case"), *review denied* (Minn. Oct. 16, 2001). Here, the district court's order and accompanying memorandum granting relief to respondent primarily discussed fact issues and reduced its decision denying the city statutory and official immunity to one sentence with no discussion. It is apparent that the district court found, as we do, that statutory immunity and official immunity are not at issue; this is a contract case and there are material fact issues in dispute. However, it makes a cleaner record if respondent's counterclaims, sounding in tort, are dismissed, because to the extent that they might have any viability as a counterclaim, the city enjoys statutory and official immunity.

The essential facts here are that respondent wanted to build a parking ramp for its business. If respondent owns it, there will be property taxes to pay. If the city buys it, those taxes disappear. For the city to buy it, it must issue bonds, putting taxpayers at risk. To cover that risk, the city required respondent to agree to cover any shortfall. At the time of the hearing, the shortfall was approximately $2.5 million, and both sides agree that there has been a demand and a refusal. When the city sued for the balance, respondent essentially counterclaimed to cover itself. Put another way, respondent counterclaimed in an effort to preserve its defenses in the contract action. In the context of the case, respondent's counterclaim is a defense tactic because the purpose was to preserve respondent's ability to present its defenses to the contract action on the merits. At oral argument, respondent readily conceded that it had no claim for any independent monetary damages outside of its desire to avoid liability for appellants' claimed monetary damages in the breach-of-contract suit.

To the extent that the district court's denial of appellants' motion for summary judgment keeps alive respondent's alleged counterclaims, that denial as to the counterclaims is reversed, and respondent's counterclaims are dismissed.

Our decision does not affect in any way respondent's ability to attempt to prove as a defense to the breach of contract its two salient claims, which, as we set out above, are (1) appellants intentionally did not provide negative information, and (2) appellants intentionally offered projections on income and expenses that they knew were flawed. Both sides agree that the record shows during the negotiations the concept of free sharing of information by appellants. Appellants claim that does not mean they have to submit every single document on every other study of a ramp (the city has bought and leased close to a dozen other ramps). Those are trial issues. Both sides have every opportunity to prove their own due diligence during negotiations. Discovery is still open.

## DECISION

Immunity is a defense to a tort action. This is a contract action. We reverse the district court's denial of appellants' motion for summary judgment as to respondent's counterclaims, and dismiss the counterclaims. We emphasize that our decision in no way affects respondent's ability to attempt to prove, as a defense to the breach

of contact, its claims. Respondent's claims are that appellants' own actions prevented it from prevailing on the contract issue. Respondent can present its defenses even when respondent's defense parallels its dismissed tort counterclaims.

**Reversed and remanded.**